Massachusetts, Minnesota, New York, Nevada, North Dakota, Pennsylvania, Ohio, Virginia and Washington State.

60.    The Congressional investigation revealed that the prices of more than 1,200 generic medications increased an average of 448 percent between July 2013 and July 2014.[21]

61.    After a Senate hearing on February 24, 2015, Rep. Cummings and Sen. Sanders wrote to the U.S. Department of Health & Human Services' Office of the Inspector General ("OIG") asking OIG to investigate how Defendants' price increases affected spending in the Medicare and Medicaid programming.[22]  OIG accordingly began to review quarterly average manufacturer prices for the top 200 generic drugs from 2005 to 2014.[23]

62.    The DOJ also launched a probe into alleged price-fixing among generic manufacturers.  In November 2014, the DOJ issued grand jury subpoenas to many generic manufacturers requesting documents, information, and testimony relating to "communication or correspondence with any competitor in the sale of generic prescription medications." Impax Laboratories, Inc. was the first to disclose having received a subpoena.[24]  In September 2016, Taro Pharmaceuticals, disclosed that it, "as well as two senior officers in its commercial team, received grand jury subpoenas from the [DOJ]," seeking, among other things, "communications with competitors and others regarding the sale of generic pharmaceutical products."[25]

63.    On December 12, 2016, the DOJ filed criminal informations against Jeffrey Glazer ("Glazer") and Jason Malek, the respective former Chief Executive Officer and President of

---

[21] "Generic Drug Price Sticker Shock Prompts Probe by Congress," ABC News, Nov 21, 2014, By Gillian Mohney. http://abcnews.go.com/Health/generic-drug-prices-skyrocketing-lawmakers-warn/story?id=27060992.
[22] http://www.sanders.senate.gov/download/sanders-cummings-letter?inline=file.
[23] http://www.sanders.senate.gov/download/oig-letter-to-sen-sanders-4-13-2015?inline=file.
[24] Impax Laboratories, Inc. Current Report (Form 8-K) (November 3, 2014).
[25] Taro, SEC Form 6-K (Sept. 9, 2016), http://phx.corporate-ir.net/phoenix.zhtml?c=114698&p=irol-SECText&TEXT=aHR0cDovL2FwaS50ZW5rd2l6YXJkLmNvbS9maWxpbmcueG1sP2lwYWdlPTExMTM0MjUwJkRTRVE9MCZTRVE9MCZTUURFU0M9U0VDVElPTl9FTlRJUkUmc3Vic2lkPTU3.

Heritage Pharmaceutical, Inc.  These informations accuse Malek and Glazer of conspiring to "knowingly enter[] into and engag[ing] in a combination and conspiracy other persons and entities engaged in the production and sale of generic pharmaceutical products, including doxycycline hyclate, the primary purpose of which was to allocate customers, rig bids, and fix and maintain prices of doxycycline hyclate sold in the United States."[26]

64.     A press release issued by DOJ in conjunction with these filings stated:

"Millions of Americans rely on prescription medications to treat acute and chronic health conditions.  By entering into unlawful agreements to fix prices and allocate customers, these two executives sought to enrich themselves at the expense of sick and vulnerable individuals who rely upon access to generic pharmaceuticals as a more affordable alternative to brand-name medicines," said Deputy Assistant Attorney General Brent Snyder of the Justice Department's Antitrust Division. "These charges are an important step in correcting that injustice and in ensuring that generic pharmaceutical companies compete vigorously to provide these essential products at a price set by the market, not by collusion."

"Conspiring to fix prices on widely-used generic medications skews the market, flouts common decency – and very clearly breaks the law," said Special Agent in Charge Michael Harpster of the FBI's Philadelphia Division.  "It's a sad state of affairs when these pharmaceutical executives are determined to further pad their profits on the backs of people whose health depends on the company's drugs. The FBI stands ready to investigate and hold accountable those who willfully violate federal antitrust law."

Today's charges are the result of an ongoing federal antitrust investigation into price fixing, bid rigging and other anticompetitive conduct in the generic pharmaceutical industry, which is being conducted by the Antitrust Division's Washington Criminal I Section with the assistance of the FBI's Philadelphia Division, the FBI headquarters' International Corruption Unit, the United States Postal Service Office of Inspector General and the U.S. Attorney's Office for the Eastern District of Pennsylvania.[27]

---

[26] "Information," p. 2 (December 12, 2016) (ECF No. 1) in *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa.); "Information," p. 2 (December 12, 2016) (ECF No. 1) in *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa.).

[27] https://www.justice.gov/opa/pr/former-top-generic-pharmaceutical-executives-charged-price-fixing-bid-rigging-and-customer.

65.    On December 14, 2016, the attorneys general ("AG") of twenty states filed a complaint against multiple generic manufacturers of doxycycline hyclate for conspiring to fix the prices and allocate the market for this medication.[28]

66.    The AG Complaint alleges a "wide-ranging series of conspiracies implicating numerous different drugs and competitors."[29]  The Complaint identifies that the conspiracy among multiple generic drug manufacturers is facilitated by direct communications among competitors concerning pricing and market allocation.[30]  Defendants attempted to conceal evidence of their communications by deleting texts and other writings.  Defendants also had an opportunity to coordinate their price-fixing schemes while attending various trade association meetings or customer-sponsored conferences.[31]  Further opportunities occurred during industry dinners or "Girls Night Out," attended by officers and executives of various generic drug manufacturers, during which the attendees discussed competitively sensitive information.[32]  Consequently, the supposed competitors "are often acutely aware of their competition and, more importantly, each other's current and future business plans."[33]

67.    The AG Complaint makes it clear that the price increases are not the result of market forces, but are the result of the conspiracy alleged herein, stating:

> "Generic drug manufacturers argued publicly that the significant price increases [for generic drugs] were due to a myriad of benign factors, such as industry consolidation, FDA-mandated plant closures, or elimination of unprofitable generic drug product lines. What the Plaintiff States have found through their investigation, however, is that the reason underlying many of these price increases is much more straightforward, and sinister – collusion among generic drug competitors." [34]

---

[28] *State of Connecticut v. Aurobindo Pharma USA, Inc., et al.*, No. 3:16-cv-2056 VLB (D. Conn.).
[29] *Id. at* ¶9.
[30] *Id. at* ¶¶11 – 12.
[31] *Id. at* ¶¶49 – 52.
[32] *Id. at* ¶¶54 – 57.
[33] *Id. at* ¶61.
[34] *Id. at* ¶6.

**E.     Collusion in the Generic Drug Market.**

68.     The United States' generic Propranolol capsules and tablets market displays various qualities that place it at risk of collusion and other anticompetitive behavior.  Such qualities include: (1) high concentration; (2) high barriers to entry; (3) inelasticity of demand; (4) lack of available product substitutes; and (5) opportunities to conspire.

69.     As above, Defendants used various means of direct communications, trade association meetings, including those sponsored by GPhA, customer conferences, industry dinners and girls nights out as opportunities to meet in furtherance of this conspiracy.

70.     The purpose of these secret, conspiratorial meetings, discussions, and communications was to ensure that all Defendants agreed to participate in, implement, and maintain an unlawful price-fixing and market and customer allocation scheme.

71.     Further, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to third parties, including Plaintiff and Class Members.  Due to Defendants' conduct, Plaintiff and Class Members could not have known that they were paying an artificially inflated price for generic Propranolol capsules and tablets. Therefore, Defendants are estopped from asserting any applicable statute of limitations in defense of this action.

72.     As a result of Defendants' unlawful agreements, Plaintiff and members of the Classes were injured because they paid, and continue to pay, supracompetitive prices for generic Propranolol sold in the United States during the Propranolol Capsules Class Period and the Propranolol Tablets Class Period.

### 1.     Concentration in the Market.

73.     Concentration in a market for goods creates susceptibility for collusion and other anticompetitive conduct.  The market for generic Propranolol capsules and tablets is highly concentrated.  Defendants each possess large market shares in their respective markets.  The limited number of manufacturers in this market facilitated Defendants' ability to coordinate prices of their generic drugs.

74.     The market for generic Propranolol capsules and tablets is mature and Defendants can only compete on price in order to gain market share.  Per IMS Health sales data, annual sales of just generic Propranolol were approximately $101 million for the twelve months ended March 2014.

### 2.     High Barriers to Entry.

75.     Typically, markets for goods that have high prices attract new competitors who can undercut competition by offering lower prices to the consuming public, thus mitigating effects of collusion.  However, when a market has high barriers to entry, new competitors are less likely to enter the market.  Accordingly, high barriers to entry facilitate collusive behavior.

76.     The market for generic Propranolol capsules and tablets has high barriers to entry, including regulatory, intellectual property and financial hurdles.

77.     All generic drug manufacturers must receive FDA approval prior to marketing and selling products.  FDA approval requires, inter alia, the preparation and filing of an ANDA, which typically costs at least $1 million.[35]  Bringing a new generic drug to market may cost another $5 to $20 million.[36]

---

[35] Testimony of Dr. Scott Gottlieb, Hearing on "*Why Are Some Generic Drugs Skyrocketing in Price?*" (Nov. 20, 2014), available at https://www.aei.org/wp-content/uploads/2014/11/Gottlieb-Generic-Drug-Testimony-112014.pdf, at 7.
[36] *Id.*

78.     Further, both state and federal law govern the operation of drug manufacturing facilities.  Such costs of doing business are another regulatory barrier to entry for potential competitors.

79.     Intellectual property costs can include acquisition of, and litigation over, patent rights, either through the investigation of whether a drug compound is protected by a valid patent or for establishment of preferred generic treatment under the Hatch-Waxman Act.  Transactional costs such as licensing deals can add further layers of costs.

80.     Finally, generic drug makers also incur large research and development costs, high labor costs to retain employees with specialized skills and knowledge as well as professional certifications suitable for the work required, significant capital outlay for sufficient real estate and equipment, and other corporate financial requirements inherent to the pharmaceutical industry.

81.     The small number of competitors in the generic Propranolol capsules and tablets market reflects these high barriers to entry.

### 3.     Inelastic Demand.

82.     In economics, elasticity of demand is the sensitivity of supply and demand to changes in one or the other.  Price elasticity is defined as the measure of how much the quantity demanded will change if price, a separate factor, changes.  When price elasticity of demand is inelastic, prices increase because there will only be a small decrease in demand relative to the price increase, such that the increases make up for the decreases.  Accordingly, total revenues rise in a market with price inelasticity of demand, even if raw sales figures go down.

83.     Perfectly inelastic demand occurs when consumers would pay anything for a good, such as food or water, which is necessary for survival.  Colluding entities can profit handsomely from goods that have nearly perfectly inelastic demand because they can charge whatever they

wish knowing, first, that consumers will pay whatever price is charged, and second, that the collusion blocks any kind of competition that should serve to lower prices in that market.

84.    Accordingly, Defendants have been able to reap materially significant profits as a result of attacking the integrity of the market for generic Propranolol capsules and tablets, as the market for the drug displays a price inelasticity of demand.

### 4.    Lack of Available Product Substitutes.

85.    As above, generic Propranolol is a beta-blocker, which causes the heart to beat more slowly and with less force, reducing blood pressure and is available by prescription. Adult patients use generic Propranolol capsules and tablets for conditions such as tremors, angina, hypertension and other heart or circulatory conditions. Other medications may not be indicated for the patient's condition.

86.    The generic Propranolol products which Defendants manufacture, while formulated differently in certain cases, are each chemical compounds composed of the same raw materials. As such, the generic Propranolol capsules and tablets manufactured by Defendants are interchangeable and reasonable substitutes for one another.

### 5.    Opportunities to Conspire.

87.    Defendants' collusive scheme works because each Defendant has constant and continuous opportunities to meet rather than to compete. All Defendants participate in some capacity in GPhA, [37] a leading trade association for generic drug manufacturers and distributors. Defendants' representatives regularly attended meetings of GPhA, including meetings in 2013 and 2015, and meetings of other trade associations during the Class Periods.

---

[37] The GPhA describes itself as "the nation's leading trade association for manufacturers and distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry."

88.     Additionally, Defendants attend industry trade shows and conferences which provide Defendants' representatives the opportunity to interact with each other directly, and discuss their respective businesses and customers.   Recreational and social events at these conferences, such as golf outings, lunches, cocktail parties, dinners, and other activities at these trade shows and conferences provide additional opportunities for conspirators to meet with competitors away from the usual business setting.  Defendants' representatives use these functions to discuss and share upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers, among other competitively-sensitive information.

89.     Moreover, the DOJ's grand jury subpoenas and informations also indicate that communications between Defendants were prevalent.  The DOJ has stated that "prosecutors are taking a close look at trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers."[38]

90.     The meetings in February and October of 2013 provided Defendants with opportunities to collude.  Shortly after the meetings, Defendants acted in concert to raise the price of generic Propranolol by a dramatic margin.  The price increases resulted from Defendants' horizontal price-fixing agreement.

91.     In this case, Defendants' common membership in GPhA provided them with opportunities to collude by sharing competitive information and collaborating on market strategies with regard to their generic Propranolol products.

92.     Further, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to third parties, including Plaintiff and Class Members.  Due to Defendants' conduct, Plaintiff and Class Members could not have known that

---

[38] http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf.

they were paying an artificially inflated price for generic Propranolol capsules and tablets. Therefore, Defendants are estopped from asserting any applicable statute of limitations in defense of this action.

## VII.   EFFECTS ON COMPETITION AND DAMAGES

93.    Defendants' combination and conspiracy as set forth in this complaint has had the following effects, among others:

      a.  Competition in the market for generic Propranolol capsules and tablets has been eliminated or substantially reduced;

      b.  Prices for generic Propranolol capsules and tablets have increased, and run contrary to the typical pricing patterns of generic drugs;

      c.  United States purchasers have been deprived of the benefit of free and open competition on the basis of price in the market for generic Propranolol capsules and tablets; and

      d.  As a direct and proximate result of Defendants' illicit anticompetitive conduct, Plaintiff and the Class of end-payors have been injured in their business and property in that, during the Propranolol Capsules Class Period and the Propranolol Tablets Class Period, they paid artificially inflated prices for generic Propranolol.

94.    As a result of Defendants' conduct as herein alleged, Plaintiff and the Class have been damaged as measured by the full amount of the overcharges that they paid in an amount subject to proof and to be determined at trial.

95.    The foregoing allegations are likely to have evidentiary support after a reasonable opportunity for discovery.

## VIII.   ANTITRUST IMPACT

96.   Supracompetitive prices at an upstream level in the chain of distribution ordinarily result in higher prices at every level below.  Such is the case here.

97.   Wholesalers and retailers passed on the supracompetitive prices of generic Propranolol capsules and tablets to Plaintiff and Class members, who consequently paid overcharges.

98.   Defendants' anticompetitive conduct enabled them to raise, fix, maintain, and stabilize prices to consumers and third-party payors in excess of the prices Defendants otherwise would have been able to charge absent their anticompetitive conduct.

99.   The supracompetitive prices paid by Plaintiff and the Class are traceable to, and the direct, proximate, and foreseeable result of, Defendants' illegal concerted pricing policies.

## IX.   CLASS ACTION ALLEGATIONS

100.   Plaintiff brings this action on behalf of itself and, under Federal Rules of Civil Procedure 23(a), (b)(l), (b)(2), and (b)(3), as a representative of a Class defined as follows: All persons or entities:

> a.      in the United States, the District of Columbia, and Puerto Rico who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for (1) generic Propranolol capsules or (2) generic Propranolol tablets manufactured by Defendants and/or their affiliates in Alabama, Arkansas, Arizona, California, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Missouri, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin, and/or

> b.      who reside in Alabama, Arkansas, Arizona, California, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Missouri, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah,

Vermont, West Virginia and Wisconsin, and indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for (1) generic Propranolol capsules or (2) generic Propranolol tablets manufactured by Defendants and/or their affiliates in the United States, the District of Colombia, or Puerto Rico for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries (the "Class"), other than for resale at any time during the period (1) from at least April 18, 2013 to the present ("Propranolol Capsules Class Period") and (2) from March 18, 2015 to the present ("Propranolol Tablets Class Period") through the date the anticompetitive effects of Defendants' challenged conduct cease (the "Class periods").

101.   The following persons or entities are excluded from the Class:

a.   Defendants and their officers, directors, management, employees, subsidiaries, or affiliates;

b.   All federal or state governmental entities, excluding cities, towns, or municipalities with self-funded prescription drug plans;

c.   All persons or entities who purchased generic Propranolol capsules and tablets for purposes of resale directly from Defendants and their affiliates;

d.   Fully insured health plans, *i.e.*, plans that purchased insurance from another third-party payor covering 100% of the plan's reimbursement obligations to its members;

e.   Any "flat co-pay" consumers whose purchases were paid in part by a third-party payor and whose co-payment was the same regardless of the retail purchase price;

f.   Pharmacy Benefits Managers; and

g.   All judges assigned to this case and any members of their immediate families.

102.   The Class members are so numerous that joinder is impracticable.  Members of the Class are widely dispersed throughout the country.  The Class includes at least hundreds of thousands of consumers and at least thousands of third-party payors.

103.   Plaintiff's claims are typical of the claims of all Class members.  Plaintiff and all

Class members were damaged by the same wrongful conduct by Defendants, *i.e.*, they paid artificially inflated prices for generic Propranolol capsules and tablets, and were deprived of the benefits of competition as a result of Defendants' wrongful conduct.

104.    Plaintiff will fairly and adequately protect and represent the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the Class.

105.    Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation, and have particular expertise with class action antitrust litigation in the pharmaceutical industry.

106.    Questions of law and fact common to the Class members predominate over any questions that may affect only individual Class members, because Defendants have acted on grounds generally applicable to the entire Class.

107.    Questions of law and fact common to the Class include:

a.    whether Defendants violated sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 and 3;

b.    whether Defendants' combination, conspiracy, or agreement constitutes a violation of the state laws set forth below;

c.    whether Defendants conspired to and did suppress competition in the market for generic Propranolol capsules and tablets;

d.    whether Defendants' challenged conduct harmed competition in the generic Propranolol capsules and tablets market;

e.    whether, and to what extent, Defendants' conduct as alleged herein caused antitrust injury to the business or property of Plaintiff and Class members in the form of overcharges; the quantum of aggregate overcharge damages paid by the class;

29

f.  whether Defendants' concealment of their conduct, as alleged in this Complaint, has equitably tolled any statute of limitations so that Defendant is estopped from asserting a statute of limitations defense by virtue of its inequitable conduct; and

g.  whether Plaintiff and Class members are entitled to injunctive relief to prevent further violation of sections 1 and 3 of the Sherman Act.

108.  Class treatment is a superior method for the fair and efficient adjudication of the controversy, because, among other things, class treatment will permit a large number of similarly situated persons to prosecute their common claims in a similar forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons and entities with a means of obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

109.  Class treatment also is appropriate under Rule 23(b)(1) and/or (b)(2) because:

a.  the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for Defendants;

b.  the prosecution of separate actions by individual Class members would create a risk of adjudication of their rights that, as a practical matter, would be dispositive of the interests of other Class members not parties to such adjudications or would substantially impair or impede other Class members' ability to protect their interests; and

c.  Defendants have acted and refused to act on grounds that apply generally to the

30

Class such that final injunctive relief and/or declaratory relief is warranted with respect to the Class as a whole.

110. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

## X.    CLAIMS FOR RELIEF

### CLAIM I
#### Violations of Section 1 of the Sherman Act, 15 U.S.C. S 1
#### (Asserted against all Defendants)

111. Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

112. Beginning at least as early as April 18, 2013 to the present ("Propranolol Capsules Class Period") and from March 18, 2015 to the present ("Propranolol Tablets Class Period"), the exact dates being unknown to Plaintiff and the Class and exclusively within the knowledge of Defendants, Defendants, acting in concert, entered into a continuing combination or conspiracy to unreasonably restrain trade and commerce in violation of section 1 of the Sherman Act, l5 U.S.C. § 1, by artificially eliminating or reducing competition in the pricing of generic Propranolol capsules and tablets in the United States.

113. Defendants combined and conspired to raise, fix, maintain or stabilize the prices of generic Propranolol in the United States during the Propranolol Capsules Class Period and the Propranolol Tablets Class Period.

114. As a result of Defendants' and their co-conspirators' unlawful conduct and acts taken in furtherance of their horizontal price-fixing conspiracy, prices for generic Propranolol sold to purchasers in the United States during the Propranolol Capsules Class Period and the Propranolol Tablets Class Period were raised, fixed, maintained or stabilized at artificially inflated

levels.

115.   The combination or conspiracy among Defendants consisted of a continuing agreement, understanding and concerted action among Defendants and their co-conspirators.

116.   For purposes of formulating and effectuating their combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially fix, raise, maintain, and/or stabilize the prices of generic Propranolol capsules and tablets. Such activities included: (a) participating in meetings to discuss their respective generic Propranolol prices and how they could coordinate their market behavior to restrain trade with regard to their generic drug products; (b) agreeing to coordinate and manipulate the prices and available supply of generic Propranolol capsules and tablets in a manner that deprived United States purchasers of free and open price competition; and (c) providing pretextual justifications to purchasers and the public to explain the changes in the prices for Defendants' generic Propranolol capsules and tablets.

117.   Defendants' concerted anticompetitive acts are illegal *per se*.

118.   As a direct and proximate result of Defendants' illegal anticompetitive conduct, Plaintiff and the Class of end-payors have been injured in their business and property in that they have paid more for the generic Propranolol capsules and tablets that they purchased during the Propranolol Capsules Class Period and the Propranolol Tablets Class Period than they otherwise would have paid absent Defendants' wrongful conduct.

119.   By reason of the foregoing, Plaintiff and the Class are entitled to injunctive relief and a reasonable attorney's fee pursuant to Section l6 of the Clayton Act, l5 U.S.C. § 26.

**CLAIM II**
**Violations of Section 3 of the Sherman Act, 15 U.S.C. S 3**
**(Asserted against all Defendants)**

120.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

121.    Beginning at least as early as April 18, 2013 to the present ("Propranolol Capsules Class Period") and from March 18, 2015 to the present ("Propranolol Tablets Class Period"), the exact dates being unknown to Plaintiff and the Class and exclusively within the knowledge of Defendants, Defendants, acting in concert, entered into a continuing combination or conspiracy to unreasonably restrain trade and commerce in violation of section 3 of the Sherman Act, l5 U.S.C. § 3, by artificially eliminating or reducing competition for the pricing of generic Propranolol capsules and tablets in any territory of the United States or in the District of Columbia.

122.    Defendants combined and conspired to raise, fix, maintain or stabilize the prices of generic Propranolol capsules and tablets in any territory of the United States or in the District of Columbia during the Propranolol Capsules Class Period and the Propranolol Tablets Class Period.

123.    As a result of Defendants' and their co-conspirators' unlawful conduct and acts taken in furtherance of their horizontal price-fixing conspiracy, prices for generic Propranolol capsules and tablets sold to purchasers in any territory of the United States or in the District of Columbia during the Propranolol Capsules Class Period and the Propranolol Tablets Class Period were raised, fixed, maintained or stabilized at artificially inflated levels.

124.    The combination or conspiracy among Defendants consisted of a continuing agreement, understanding and concerted action among Defendants and their co-conspirators.

125.    For purposes of formulating and effectuating their combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect

33

of which were to artificially fix, raise, maintain, and/or stabilize the prices of generic Propranolol capsules and tablets.  Such activities included: (a) participating in meetings to discuss their respective generic Propranolol prices and how they could coordinate their market behavior to restrain trade with regard to their generic drug products; (b) agreeing to coordinate and manipulate the prices and available supply of generic Propranolol capsules and tablets in a manner that deprived United States purchasers of free and open price competition; and (c) providing pretextual justifications to purchasers and the public to explain the changes in the prices for Defendants' generic Propranolol capsules and tablets.

126.   Defendants' concerted anticompetitive acts are illegal *per se*.

127.   As a direct and proximate result of Defendants' illegal anticompetitive conduct, Plaintiff and the Class of end-payors have been injured in their business and property in that they have paid more for the generic Propranolol capsules and tablets that they purchased during the Propranolol Capsules Class Period and the Propranolol Tablets Class Period than they otherwise would have paid absent Defendants' wrongful conduct.

128.   By reason of the foregoing, Plaintiff and the Class are entitled to injunctive relief and a reasonable attorney's fee pursuant to Section 16 of the Clayton Act, l5 U.S.C. § 26.

**CLAIM III**
**Conspiracy and Combination in Restraint of Trade in Violation of State Laws**
**(Asserted against all Defendants)**

129.   Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

130.   Beginning at least as early as April 18, 2013 to the present ("Propranolol Capsules Class Period") and from March 18, 2015 to the present ("Propranolol Tablets Class Period"), the exact dates being unknown to Plaintiff and the Class and exclusively within the knowledge of

Defendants, Defendants, acting in concert, entered into a continuing combination, conspiracy or agreement to unreasonably restrain trade and commerce in restraint of trade, the purpose and effect of which was to fix, raise, maintain or stabilize the price of generic Propranolol capsules and tablets.

131.    Defendants implemented the terms of their combination, conspiracy, or agreement and achieved their intended purpose.   As a direct and proximate result of Defendants' anticompetitive conduct, as alleged herein, Plaintiff and the Class were harmed as set forth above.

132.    Defendants' unlawful horizontal combination, conspiracy or agreement harmed competition in the market for generic Propranolol capsules and tablets.

133.    There was and is no legitimate or non-pretextual procompetitive justification for Defendants' coordinated price increases that outweighs their harmful effect.  Even if there were some conceivable justification, the coordinated price increases were not necessary to achieve that purpose.

134.    By engaging in the foregoing conduct, Defendants entered a conspiracy and combination in restraint of trade in violation of the following state laws: (a) Ala. Code § 6-5-60, *et seq.*, with respect to purchases in Alabama by members of the Damages Class; (b) Arkansas Unfair Practices Statute, Ark, Code, Ann. § 4-75-201, *et seq.* with respect to purchases in Arkansas by members of the Damages Class; (c) Ariz. Rev. Stat. §§ 44-1401, *et seq.*, with respect to purchases in Arizona by members of the Damages Class; (d) Cal. Bus. Code §§ 16700, *et seq.*, and Cal. Bus. Code §§ 17200, *et seq.*, with respect to purchases in California by members of the Damages Class; (e) D.C. Code Ann. §§ 28-4501, *et seq.*, with respect to purchases in the District of Columbia by members of the Damages Class; (f) Fla. Stat. §§ 501.201, *et seq.*, with respect to purchases in Florida by members of the Damages Class; (g) Hawaii Code § 480, *et seq.*, with

respect to purchases in Hawaii by members of the Damages Class; (h) Illinois Antitrust Act 740 Illinois Compiled Statutes 10/1, *et seq.* with respect to purchases in Illinois by members of the Damages Class, (i) Iowa Code §§ 553 *et seq.*, with respect to purchases in Iowa by members of the Damages Class; (j) Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases in Kansas by members of the Damages Class; (k) Me. Rev. Stat. Ann. 10, §§ 1101, *et seq.*, with respect to purchases in Maine by members of the Damages Class; (l) Mass. Gen. L. Ch. 93A, *et seq.*, with respect to purchases in Massachusetts by members of the Damages Class; (m) Mich. Comp. Laws Ann. §§ 445.772, *et seq.*, with respect to purchases in Michigan by members of the Damages Class; (n) Minn. Stat. §§ 325D.49, *et seq.*, with respect to purchases in Minnesota by members of the Damages Class; (o) Miss. Code Ann. §§ 75-21-1, *et seq.*, with respect to purchases in Mississippi by members of the Damages Class; (p) Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et. seq.*, with respect to purchases in Missouri by members of the Damages Class; (q) Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, §§ 30-14-103, *et seq.*, and §§ 30-14-201, *et. seq.* with respect to purchases in Montana by members of the Damages Class; (r) Neb. Code Ann. §§ 59-801, *et seq.*, with respect to purchases in Nebraska by members of the Damages Class; (s) Nev. Rev. Stat. Ann. §§ 598A, *et seq.*, with respect to purchases in Nevada by members of the Damages Class; (t) N.H. Rev. Stat. Ann. § 356:1 *et seq.*, with respect to purchases in New Hampshire by Damages Class Members; (u) N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to purchases in New Mexico by members of the Damages Class; (v) N.Y. Gen. Bus. L. §§ 340, *et seq.*, with respect to purchases in New York by members of the Damages Class; (w) N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases in North Carolina by members of the Damages Class; (x) N.D. Cent. Code §§ 51-08.1-01, *et seq.*, with respect to purchases in North Dakota by members of the Damages Class; (y) Or. Rev. Stat. §§ 6.46.705, *et*

*seq.*, with respect to purchases in Oregon by members of the Damages Class; (z) R.I. Gen. Laws §§ 6-36-1 *et seq.*, with respect to purchases in Rhode Island by members of the Damages Class; (aa) South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.*, with respect to purchases in South Carolina by members of the Damages Class; (bb) S.D. Codified Laws Ann. §§ 37-1, *et seq.*, with respect to purchases in South Dakota by members of the Damages Class; (cc) Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases in Tennessee by members of the Damages Class; (dd) Utah Code Ann. §§ 76-10-3101, *et seq.*, with respect to purchases in Utah by members of the Damages Class; (ee) Vt. Stat. Ann. 9, §§ 2453, *et seq.*, with respect to purchases in Vermont by members of the Damages Class; (ff) W.Va. Code §§ 47-18-3, *et seq.*, with respect to purchases in West Virginia by members of the Damages Class; and (gg) Wis. Stat. §§ 133.03, *et seq.*, with respect to purchases in Wisconsin by members of the Damages Class.

135.   Plaintiff and Class members have been and will continue to be injured in their business or property by reason of Defendants' violations of the laws set forth above, in that Plaintiff and Class members (i) were denied the opportunity to purchase more affordable generic Propranolol capsules and tablets, and (ii) paid higher prices for generic Propranolol capsules and tablets than they would have paid but for Defendants' unlawful conduct. Such injuries are of the type that the aforementioned laws were intended to prevent and flow from that which makes Defendants' acts unlawful.

136.   Plaintiff and the Class are entitled to actual and trebled damages as permitted by law.

**CLAIM IV**
**Violations of State Consumer Protection Statutes**
**(Asserted against all Defendants)**

137.   Plaintiff hereby incorporates each preceding and succeeding paragraph as though

fully set forth herein.

138.    Beginning at least as early as April 18, 2013 to the present ("Propranolol Capsules Class Period") and from March 18, 2015 to the present ("Propranolol Tablets Class Period"), the exact dates being unknown to Plaintiff and the Class and exclusively within the knowledge of Defendants, Defendants, acting in concert, engaged in unfair methods of competition, and unfair and unconscionable acts or practices in the course of trade, with respect to the sale of generic Propranolol capsules and tablets in violation of the following state consumer protection and unfair competition statutes: Cal. Bus. & Prof. Code § 17200, *et seq.*; D.C. Code Ann. § 28-3901, *et seq.*; Fla. Stat. § 501.201, *et seq.*; Haw. Rev. Stat. § 480-2, *et seq.*; Kan. Stat. Ann. § 50-623, *et seq.*; Mass. Gen. Laws chapter 934 § 1, *et seq.*; Mich. Comp. Laws § 445.901, *et seq.*; Miss. Code § 75-24-1, *et seq.*; Neb. Rev. Stat. § 59-1601, *et seq.*; N.H. Rev. Stat. Ann. § 358-A:1, *et seq.*; N.M. Stat. Ann. § 57-12-1, *et seq.*; N.C. Gen. Stat. § 75-1.1, *et seq.*; and Rhode Island Gen. Laws § 6-13.1-1, *et seq.*

139.    Defendants agreed to, and did, act unfairly in restraint of commerce by affecting, fixing, controlling and/or maintaining, at artificial and supracompetitive levels, the prices at which generic Propranolol capsules and tablets were sold, distributed, or obtained and made efforts to conceal their agreements from Plaintiff and the Class.

140.    Defendants' intentional anticompetitive acts, described above, were intended to and did cause Plaintiff and/or Class members to pay supracompetitive prices for generic Propranolol capsules and tablets in the states listed above.

141.    All of Defendants' unlawful and unfair conduct occurred in the course of their business and was part of a generalized course of conduct.

142.    As a direct and proximate result of the Defendants' unfair methods of competition

and unfair and unconscionable trade practices, Plaintiff and the Class have been injured in their business and property in that they paid more for generic Propranolol capsules and tablets than they otherwise would have paid in the absence of Defendants' unlawful and unfair conduct.

143.    Plaintiff and the Class are therefore entitled to appropriate relief as provided for by the laws of the states set forth above, including but not limited to damages, injunctive relief, reasonable attorneys' fees, and equitable relief, such as restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits Defendants obtained by reason of their unlawful and unfair conduct.

## XI.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of itself and the Class, respectfully requests that the Court:

A.    Determine that this action may be maintained as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3), and direct that reasonable notice of this action, as provided by Federal Rule of Civil Procedure23(c)(2), be given to the Class, and designate the Plaintiff as the representative of the Class;

B.    Enter joint and several judgments against Defendants and in favor of Plaintiff and the Class;

C.    Award the Class damages and, where applicable, treble, multiple, punitive, and/or other damages, in an amount to be determined at trial, including interest;

D.    Grant Plaintiff and the Class equitable relief in the nature of disgorgement, restitution, and establishment of a constructive trust to remedy Defendants' illegal conduct, including: